**United States District Court**
**Eastern District of North Carolina**
**Northern Division**

| | |
|---|---|
| **Holly Lynn Koerber** and **Committee for Truth in Politics, Inc.**, *Plaintiffs*, *v.* **Federal Election Commission**, *Defendant*. | Case No. _____ |

## Verified Complaint for Declaratory and Injunctive Relief

Holly Lynn Koerber and Committee for Truth in Politics, Inc. ("CTP") complain as follows:

### INTRODUCTION

1. Government may only require "*disclosure* of what an individual or group . . . spends,*" Buckley v. Valeo*, 424 U.S. 1, 75 (1976) (emphasis added), for independent communications touching on candidates and issues, *id.* (i.e., that might be considered "'for the purpose of . . . influencing' the nomination or election of candidates for federal office"), if the communications are "*unambiguously* related to the *campaign* of a particular federal candidate," *id.* at 80 (emphasis added).

2. This unambiguously-campaign-related requirement was applied in *FEC v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007) ("*WRTL II*") (Roberts, C.J., joined by Alito, J.) (stating holding) to limit the scope of "electioneering communications" to those that meet the appeal-to-vote test, i.e., they "[are] susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *id.* at 2667, with all doubts resolved in favor of free speech, *id.* at 2667, 2669 n.7, 2674. Although *WRTL II* involved a challenge to the electioneering

communication *prohibition*, the unambiguously-campaign-related principle that it applied also governs disclosures, *Buckley*, 424 U.S. at 80, so that the appeal-to-vote test is the application of the unambiguously-campaign-related principle to any *regulation* of electioneering communications.

3. The Fourth Circuit follows *Buckley* in holding that the unambiguously-campaign-related requirement applies to *all* campaign-finance *regulation*: "campaign finance laws may constitutionally *regulate* only those actions that are 'unambiguously related to the campaign of a particular . . . candidate.'" *North Carolina Right to Life v. Leake*, 525 F.3d 274, 282 (4th Cir. 2008) (*quoting Buckley*, 424 U.S. at 80) (emphasis added). "This is because only unambiguously campaign related communications have a sufficiently close relationship to the government's acknowledged interest in preventing corruption to be constitutionally *regulable*." *Id.* (*citing Buckley*, 424 U.S. at 80) (emphasis added).

4. The Fourth Circuit holds that the unambiguously-campaign-related requirement permits government to only *regulate* communications that contain magic-words "express advocacy" (such as "vote for') or "electioneering communications" limited in scope by *WRTL II*'s appeal-to-vote test:

> Pursuant to their power to regulate elections, legislatures may establish campaign finance laws, so long as those laws are addressed to communications that are unambiguously campaign related. The Supreme Court has identified two categories of communication as being unambiguously campaign related. First, "express advocacy," defined as a communication that uses specific election-related words. Second, "the functional equivalent of express advocacy," defined as an "electioneering communication" that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." This latter category, in particular, has the potential to trammel vital political speech, and thus *regulation* of speech as "the functional equivalent of express advocacy" warrants careful judicial scrutiny.

*Leake*, 525 F.3d at 282-83 (emphasis added).

5. Despite *WRTL II*'s clear application of *Buckley*'s unambiguously-campaign-related principle to the scope of regulable electioneering communications through the appeal-to-vote test, the FEC refused in its rulemaking implementing *WRTL II* to exempt from the Disclosure Requirements (*see infra*) electioneering communications that are not unambiguously campaign related under *WRTL II*'s appeal-to-vote test. *See infra*.

6. CTP is an issue-advocacy, nonprofit, ideological corporation that is presently engaging in constitutionally-protected "issue advocacy" advertising (*see infra*). "Issue advocacy conveys information and educates. An issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose—uninvited by the ad—to factor it into their voting decisions." *WRTL II*, 127 S. Ct. at 2667.

7. Holly Lynn Koerber is a resident of Elizabeth City, North Carolina, one of the places where CTP is broadcasting its issue advocacy, who wishes to exercise the First Amendment right to continue hearing CTP's issue-advocacy speech.

8. Because CTP's ads fits the statutory "electioneering communication" definition (they are, inter alia, being broadcast within 60 days of the general election and reference a public official who is a candidate), and because CTP has spent more than $10,000 to communicate its ads, CTP and its ads are presently subject to the Disclosure Requirements.

9. But CTP's ads are not unambiguously campaign related under *WRTL II*'s appeal-to-vote test because they "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate." *Id.* at 2670.

10. The Disclosure Requirements include a Reporting Requirement and a Disclaimer Requirement. *See infra*. CTP is presently complying with the Disclaimer Requirement, although it challenges it, but CTP is not complying with the Reporting Requirement because the First

Amendment protects CTP by forbidding Congress from requiring disclosure as to expenditures for independent communications that are not "unambiguously related to the campaign of a particular federal candidate." *Buckley*, 424 U.S. at 80.

11. CTP requires this Court's protection from an unconstitutional and unauthorized investigation, enforcement action, and penalties for its refusal to comply with unconstitutional and unauthorized provisions.

12. This is an as-applied challenge to the constitutionality of **(a) § 201** of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), Pub. L. No. 107-155, 116 Stat. 81, 88-89, titled "Disclosure of Electioneering Communications," which added a new subsection "(f)" to § 304 of the Federal Election Campaign Act ("FECA") that requires reporting of electioneering communications and **(b)** BCRA **§ 311**, 116 Stat. 105, requiring that electioneering communications contain "disclaimers." *See* 11 C.F.R. § 110.11. BCRA § 201 is called herein the "**Reporting Requirement**," BCRA § 311 is called the "**Disclaimer Requirement**," and the requirements together are called the "**Disclosure Requirements**" for ease of identification. The Reporting Requirement is codified at 2 U.S.C. § 434(f). The Disclaimer Requirement is codified at 2 U.S.C. § 441d(a).

13. The Disclosure Requirements are challenged as applied to CTP, its present ads, materially-similar future ads, and to all statutory electioneering communications that lack an "electioneering nature," *WRTL II*, 127 at 2667, because they "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate," *id.* at 2670, and so are not "unambiguously related to the campaign of a particular federal candidate," *Buckley*, 424 U.S. at 80, and are consequently unconstitutionally overbroad in violation of the First Amendment.

14. This is also a facial and as-applied challenge to the FEC's enforcement policy as to *Buckley*'s major-purpose test for imposing "political committee" ("PAC") status, 424 U.S. 1 at 79 (PAC status may only be imposed on "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate"), under 2 U.S.C. § 431(4) (PAC definition). *See* FEC, "Political Committee Status . . . ," 69 Fed. Reg. 68056 (Nov. 23, 2004) ("*PAC Status 1*"); FEC, "Political Committee Status," 72 Fed. Reg. 5595 (Feb. 7, 2007) ("*PAC Status 2*"). The FEC policy examines "*a* major purpose" instead of "*the* major purpose" of an entity, *Leake*, 525 F.3d at 287 (requiring the latter), to determine PAC status, and it employs a vague and overbroad totality-of-the-circumstances test for determining major purpose instead of the required "empirical judgment as to whether an organization primarily engages in *regulable*, election-related speech," *id.* (emphasis added).

15. The FEC's PAC enforcement policy is challenged as unconstitutional, facially and as applied to CTP and its activities, and as void for being beyond FEC authority under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706.

16. CTP seeks a judgment from this Court declaring (**a**) that the ads set out herein are neither express advocacy (including under 11 C.F.R. § 100.22(b)) nor electioneering communications that may be prohibited under *WRTL II*'s appeal-to-vote test, 127 S. Ct. at 2667; (**b**) that the Disclosure Requirements are unconstitutional as applied to the ads and to all electioneering communications not subject to prohibition under *WRTL II*'s appeal-to-vote test; and (**c**) that the FEC's PAC enforcement policy is unconstitutional, beyond FEC authority, void, and set aside under the APA. 5 U.S.C. § 706.

17. CTP also seeks preliminary and permanent injunctive relief enjoining the FEC from enforcing (**a**) the Disclosure Requirements, as applied to CTP's present ads and materially-

similar future ads and to all electioneering communications not subject to prohibition under *WRTL II*'s appeal-to-vote test, and (**b**) the provisions of the Federal Election Campaign Act ("FECA") concerning "political committee" status, both facially and as applied to CTP and its activities, as set out herein.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 as a case arising under the First and Fifth Amendments, FECA, the judicial review provisions of the APA, 5 U.S.C. §§ 702-06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(3), because Defendants are entities of the United States, Holly Lynn Koerber, who wishes to exercise the First Amendment right to receive information from CTP, resides in Elizabeth City, North Carolina, and CTP resides in North Carolina and has been broadcasting its ads in Elizabeth City.

## PARTIES

20. Holly Lynn Koerber is a resident of Elizabeth City, North Carolina, where CTP is broadcasting its issue advocacy, who wishes to exercise the First Amendment right to continue hearing CTP's ads and materially-similar future issue advocacy.

21. CTP is a nonstock, nonprofit, North Carolina corporation with its principal place of business in Cary, North Carolina.

22. FEC is the federal government agency with enforcement authority over FECA. Its headquarters are located in Washington, District of Columbia. Purporting to act pursuant to its statutory authority, the FEC adopted the PAC enforcement policy at issue in this case.

## FACTS

23. Holly Lynn Koerber is a resident of Elizabeth City, North Carolina, where she has been

able to receive a broadcast of CTP's two present ads, *Basic Rights* and *Tragic, but True*. She wants to continue exercising the First Amendment right to receive CTP's speech, but reasonably fears that CTP will be silenced and she will be unable to continue receiving CTP's ads and materially-similar ads, all in violation of her First Amendment rights.

24. CTP was incorporated in September 2008.

25. CTP is a North Carolina nonstock corporation exempt from tax under 26 U.S.C. § 501(c)(4) as an organization primarily devoted to social welfare.

26. CTP meets the criteria for an *MCFL*-corporation so that it may not be prohibited from making express-advocacy "independent expenditures," *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 263-64 (1986) ("*MCFL*"), or from making "electioneering communications," *McConnell v. FEC*, 540 U.S. 93, 210 (2003), that may be prohibited under *WRTL II*'s appeal-to-vote test, 127 S. Ct. at 2667. Specifically, CTP (a) "was formed for the express purpose of promoting political ideas, and cannot engage in business activities"; (b) "has no shareholders or other persons affiliated so as to have a claim on its assets or earnings"; and (c) "was not established by a business corporation or a labor union, and it is its policy not to accept contributions from such entities." *MCFL*, 479 U.S. at 264.

27. CTP is also a "qualified nonprofit corporation" under the FEC's term for *MCFL*-corporations, because it meets the requirements of 11 C.F.R. § 114.10.

28. CTP is not a PAC because it neither is controlled by a candidate nor has "*the* major purpose," *Leake*, 525 F.3d at 287, of "primarily engag[ing] in regulable, election-related speech," *id.*, so that its major purpose is not the "nomination or election of a candidate." *Buckley*, 424 U.S. at 79. Rather, the majority of CTP's activities will be nonpolitical-intervention, social welfare activities, including lobbying. Although broadcasting CTP's ads set out herein and the

materially-similar ads that CTP intends to broadcast are not "regulable election-related speech," *Leake* 525 F.3d at 287, on which a determination of PAC-status may be based, they will not be the primary activity of CTP. Expenditures for solicitations to CTP will be insubstantial.

29. As set out in its Articles of Incorporation, CTP's purposes are as follows:

> Purpose. The Corporation is organized for the purpose of promoting the social welfare of the people of North Carolina by: (a) Advocating honesty in government; (b) Advocating limited government; and (c) Engaging in any and all lawful activities that are appropriate to carry out and fulfill any or all of the foregoing purposes.

30. As set out in its Articles of Incorporation, CTP's prohibited activities are as follows:

> Prohibited Activities. Notwithstanding any other provision of these Articles, the Corporation shall not, except to an insubstantial degree, carryon any activities not permitted to be carried on by an organization exempt from Federal income tax under Section 501(c)(4) of the Internal Revenue Code of 1986, as amended ("Code"), or the corresponding provision of any subsequent federal tax laws.

31. CTP is broadcasting an ad titled *Basic Rights* on television stations in Wilmington, North Carolina, that broadcast into Elizabeth City, North Carolina. *Basic Rights* was broadcast on stations in Pennsylvania, North Carolina, and Wisconsin on October 2, 2008, and it is scheduled to be broadcast in those states on October 3, 2008. CTP intends to also broadcast an ad titled *Tragic, but True*.

32. The script of ***Basic Rights*** is as follows:

Client: CTP
Title: "Basic Rights"
Code: CTP08-TV-01
Length: 30
Draft: 9/29/08 – CG

| VIDEO | AUDIO |
|---|---|
| | |
| CG: VOTED AGAINST PROTECTING INFANTS | **Announcer:** Senator Obama.<br><br>Why did you vote against protecting infants that survived late term abortions? |

| | |
|---|---|
| CG: NOT ONCE BUT FOUR TIMES; ILL. SB 1095, 3/27/01; ILL. SB 1662, 3/5/02; ILL. SB 1662, 4/4/02; ILL. SB 1082, 3/12/03 | Not once, but four times. |
| CG: CONGRESS UNANIMOUSLY SUPPORTED PROTECTIONS<br>*Source: H.R. 2175;Congressional Record, 7/18/02; Page S. 7084* | Even Congress unanimously supported protections identical to those you blocked in Illinois. |
| CG: UPHELD BY SUPREME COURT<br>*Source: Gonzales v. Carhart Et Al.; 4/18/07* | The Supreme Court upheld the ban on partial birth abortions. |
| CG: BARACK OBAMA CO-SPONSORED SENATE BILL 1173<br>*Source: S. 1173; Congressional Record; Introduced 4/19/07; Co-sponsored 5/11/07* | And yet today, you keep working to roll back this law. |
| CG: CALL SENATOR OBAMA<br>CG: 202-224-2854<br>*Disclaimer: PAID FOR BY COMMITTEE FOR TRUTH IN POLITICS, 102-K COMMONWEALTH COURT, CARY, NORTH CAROLINA 27511. NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATE'S COMMITTEE.* | Call Senator Obama. Tell him to stop trying to overturn these basic human rights.<br><br>The Committee for Truth in Politics is responsible for the content of this advertising. |
| | |

33. The Script of ***Tragic, but True*** is as follows:

Client: CTP
Title: "Tragic but True"
Code: CTP08-TV-02
Length: 30
Draft: 9/29/08 – CG

| VIDEO | AUDIO |
|---|---|
| | |
| CG: TRAGIC. BUT TRUE. | **Announcer:** It's tragic, but true. |
| CG: MAJORITY OF SEX CRIMES ARE COMMITTED AGAINST A CHILD | Two thirds of all prisoners convicted of rape or sexual assault committed |

| | |
|---|---|
| *Source: U.S. Dept. of Justice, Bureau of Statistics* | their crime against a child. |
| CG: EXPLOITS 7 TO 200 VICTIMS *Source: U.S. Dept. of Justice, Bureau of Statistics* | Even worse, the average child predator exploits seven to two hundred victims in their lifetime. |
| CG: BARACK OBAMA VOTED TO ALLOW EARLY RELEASE FOR CONVICTED SEXUAL ABUSERS *Source: ILL. SB 485, 3/11/99* | In the Illinois Senate, Barack Obama was the only member that voted to allow early release for convicted sexual abusers. |
| CG: CALL SENATOR OBAMA CG: 202-224-2854 CG: SUPPORT THE PREVENTION AND DETERENCE OF CRIMES AGAINST CHILDREN ACT CG: INNOCENT LIVES ARE AT STAKE *Disclaimer: PAID FOR BY COMMITTEE FOR TRUTH IN POLITICS, 102-K COMMONWEALTH COURT, CARY, NORTH CAROLINA 27511. NOT AUTHORIZED BY ANY CANDIDATE OR CANDIDATE'S COMMITTEE.* | Call Senator Obama. Tell him to support the Prevention and Deterence of Crimes Against Children Act. The Committee for Truth in Politics is responsible for the content of this advertising. |
| | |

34. CTP has not, and will not, coordinate the production and broadcast of *Basic Rights* and *Tragic, but True* (collectively "**Ads**") with any candidate, campaign committee, political committee, or political party.

35. The Ads meet the electioneering communications definition at 2 U.S.C. § 434(f)(3) and 11 C.F.R. § 100.29 because each will be a "broadcast, cable, or satellite communication," *id.* at § 100.29(a), that "[r]efers to a clearly identified candidate for Federal office," *id.*, and "[i]s publicly distributed with 60 days before a general election for the office sought by the candidate." *Id.*

36. Because the Ads are electioneering communications, they are subject to the Disclaimer

Requirement, codified at 2 U.S.C. § 441d(a). The Ads include the prescribed disclaimer language, *see* 11 C.F.R. § 110.11, but CTP challenges the constitutionality of requiring the prescribed disclaimer and it would prefer to use a shorter identification of itself so as not to consume so much valuable advertising time.

37. Because CTP has spent more than $10,000 in 2008 "for the direct costs of producing and airing" *Basic Rights*, CTP is subject to the Reporting Requirement, codified at 2 U.S.C. § 434(f)(1).

38. Under the Reporting Requirement, once CTP reached the $10,000 trigger amount (the "disclosure date," *id.*), it was to have filed the required report "within 24 hours." *Id.*

39. CTP reached the $10,000 trigger amount ("disclosure date") on October 2, 2008, making its report due on October 3, 2008.

40. CTP has not filed the required report and so is currently in violation of the Reporting Requirement.

41. CTP reasonably fears that a complaint will be filed against it for noncompliance with the Reporting Requirement, that the FEC will initiate an investigation and enforcement action, and that CTP may suffer penalties for noncompliance, all in violation of CTP's First Amendment rights.

42. CTP also reasonably fears that the FEC may deem CTP to be a political committee under the FEC's vague, overbroad, and unauthorized PAC enforcement policy, in violation of CTP's First and Fifth Amendment rights. *See PAC Status 1*; *PAC Status 2*. The policy examines "*a* major purpose" instead of "*the* major purpose" of an entity, *Leake*, 525 F.3d at 287 (requiring the latter), to determine PAC status, and it employs a vague and overbroad totality-of-the-circumstances test for determining major purpose instead of the required "empirical judgment as

to whether an organization primarily engages in *regulable*, election-related speech," *id.* (emphasis added).

43. CTP reasonably fears that a complaint will be filed against it for noncompliance with FECA's PAC requirements, that the FEC will initiate an investigation and enforcement action, and that CTP may suffer penalties for noncompliance, all in violation of CTP's First and Fifth Amendment rights.

44. CTP intends to continue its issue advocacy by broadcasting ads that are materially-similar to the Ads in that they will contain similar issue advocacy, but will similarly not be 'unambiguously related to the campaign of a particular . . . candidate,'" *id.* at 282 (*quoting Buckley*, 424 U.S. at 80) (emphasis added), because they "may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate," *id.* at 2670.

45. In addition, CTP's materially-similar ads will be consistent with protected ads under the "safe harbor" in the FEC's own regulation implementing *WRTL II*, 11 C.F.R. § 114.15, in that they will fit the following criteria:

> (1) Does not mention any election, candidacy, political party, opposing candidate, or voting by the general public;
> (2) Does not take a position on any candidate's or officeholder's character, qualifications, or fitness for office; and
> (3) Either:
> (i) Focuses on a legislative, executive or judicial matter or issue; and
> (A) Urges a candidate to take a particular position or action with respect to the matter or issue, or
> (B) Urges the public to adopt a particular position and to contact the candidate with respect to the matter or issue . . . .

46. CTP is at risk for the irreparable harm of an investigation, an enforcement action, and possible penalties, and has no adequate remedy at law.

# Count 1—*Ads*

47. CTP realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

48. CTP seeks a declaration that the Ads (*Basic Rights* and *Tragic, but True*) are neither express advocacy under 11 C.F.R. § 100.22(b) nor electioneering communications that may be prohibited under *WRTL II*'s appeal-to-vote test, 127 S. Ct. at 2667. This is necessary because in another district court in this Circuit, the FEC took the litigation position that a similar communication was neither express advocacy nor subject to prohibition under *WRTL II*'s appeal-to-vote test, but the district court decided that the communication was in fact express advocacy under 11 C.F.R. § 100.22(b).[1] CTP's argument that it should not be subject to the Disclosure Requirements or the FEC's PAC-status enforcement policy is premised on the fact that the Ads

---

[1]The ad at issue, titled *Change*, is as follows:

 (Woman's voice) Just what is the real truth about Democrat Barack Obama's position on abortion?

 (Obama-like voice) Change. Here is how I would like to change America . . . about abortion:

- Make taxpayers pay for all 1.2 million abortions performed in America each year
- Make sure that minor girls' abortions are kept secret from their parents
- Make partial-birth abortion legal
- Give Planned Parenthood lots more money to support abortion
- Change current federal and state laws so that babies who survive abortions will die soon after they are born
- Appoint more liberal Justices on the U.S. Supreme Court.

One thing I would *not* change about America is abortion on demand, for any reason, at any time during pregnancy, as many times as a woman wants one.

 (Woman's voice). Now you know the real truth about Obama's position on abortion. Is this the change that you can believe in?

 To learn more real truth about Obama, visit www.TheRealTruthAboutObama.com. Paid for by The Real Truth About Obama.

In *The Real Truth About Obama, Inc. v. FEC*, No. 3:08-cv-483, this ad was set out in the *Verified Complaint*, Dkt. 1 at 5-6; the FEC said that *Change* was protected issue advocacy, not express advocacy under 11 C.F.R. § 100.22(b) or a prohibited electioneering communication under *WRTL II*'s appeal-to-vote test, 127 S. Ct. at 2667, Dkt. 32 at 6; but the Court said that *Change* was express advocacy under 11 C.F.R. § 100.22(b). Dkt. 77 at 13-14 (mem. op. denying prelim. inj.; Sep. 24, 2008) (all documents available on PACER).

are neither express advocacy nor subject to regulation under *WRTL II*'s appeal-to-vote test, so this is a necessary first step in this Court's analysis.

## Count 2—Disclosure Requirements

49. CTP realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

50. As applied to (**a**) communications that may not be prohibited as electioneering communications under *WRTL II*, 127 S. Ct. 2652, and (**b**) CTP's Ads and materially-similar future ads, the Disclosure Requirements, i.e., BCRA §§ 201 and 311, are unconstitutional because the activity is not "unambiguously related to the campaign of a particular federal candidate," *Buckley*, 424 U.S. at 80. Failing this threshold requirement, the Disclosure Requirements do not come within congressional authority to regulate elections and are overbroad for sweeping in First Amendment activity without authority.

51. As applied to (**a**) communications that may not be prohibited as electioneering communications under *WRTL II*, 127 S. Ct. 2652, and (**b**) CTP's Ads and materially-similar future ads, the Disclosure Requirements are unconstitutional under the First Amendment guarantees of free expression and association.

## Count 3—PAC Enforcement Policy

52. CTP realleges and incorporates by reference all of the allegations contained in all of the preceding paragraphs.

53. The FEC's enforcement policy regarding PAC status is set out in two FEC policy statements: *PAC Status 1* and *PAC Status 2*.The FEC's interpretation of the major-purpose test is a central element of the FEC's PAC status enforcement policy. In *PAC Status 2*, the FEC explained that, after having initiated a rulemaking proceeding, it declined to adopt a rule for the

major-purpose test, declaring that "the major purpose doctrine . . . requires the flexibility of a case-by-case analysis of an organization's conduct." *Id*. *PAC Status 2*, 72 Fed. Reg. at 5601. Instead, it set out its vague and overbroad enforcement policy regulating major purpose, requiring the FEC to engage in "a fact intensive inquiry," in order to weigh various vague and overbroad factors with undisclosed weight, requiring "investigations into the conduct of specific organizations that may reach well beyond publicly available statements," including all an organization's "spending on Federal campaign activity" (but not limited to spending on regulable activity) and other spending, and public and non-public statements, including statements to potential donors. *Id.*

54. *PAC Status 2* identified the "major purpose" at issue in its major-purpose test as being "*Federal campaign activity*," *id.* at 5605 (emphasis added), not the narrower "*nomination or election of a candidate*," which *Buckley* required as "the major purpose." 424 U.S. at 79 (emphasis added). While *MCFL* used "campaign *advocacy*," 479 U.S. at 252 (plurality opinion) (emphasis added), to "further the *election* of candidates," *id.* at 253 (plurality opinion) (emphasis added), and "campaign activity," *id.* at 262 (majority opinion), when speaking of the purpose at issue in the major-purpose test, it did so solely as synonyms for *Buckley*'s "nomination or election" requirement, which it cited and quoted, *id.* at 252 n.6 (*citing Buckley*, 424 U.S. at 79). There is no authority for the FEC's reformulation of the major-purpose test to focus on "Federal campaign *activity*."

55. *PAC Status 2* also indicated that the FEC would consider other factors in its ad hoc, totality-of-the-circumstances, major-purpose test when it discussed its application of the policy to some 527 organizations in previous investigations. *PAC Status 2*, 72 Fed. Reg. at 5603-04. These included the fact that an entity spent much of its money "on advertisements directed to

15

Presidential *battleground States* and direct mail *attacking* or expressly advocating," *id.* at 5605

(emphasis added), the fact that groups ceased activity after an election, *id.*, and the fact that they

did not make disbursements in state and local races, *id.* In addition, the FEC thought that it could

determine a 527 group's major purpose from internal planning documents and budgets, *id.*,

which would normally be protected by First Amendment privacy concerns and were only

obtained because the organization was subjected to a burdensome, intrusive investigation. Major

purpose was even based on a private thank-you letter to a donor, after the donation had already

been made. *Id.*

56. *PAC Status 2*, therefore, sets out an enforcement policy based on an ad hoc, case-by-

case, analysis of vague and impermissible factors applied to undefined facts derived through

broad-ranging, intrusive, and burdensome investigations, often begun when a complaint is filed

by a political or ideological rival, that, in themselves, can shut down an organization, without

adequate bright lines to protect issue advocacy in this core First Amendment area.

57. Under the major-purpose test set out in *Buckley*, 424 U.S. at 79, however, PAC status

may be determined by either an entity's expenditures, *MCFL*, 479 U.S. at U.S. at 262 (major

purpose calculation looks at express-advocacy independent expenditures in relation to total

expenditures: "should MCFL's independent spending become so extensive that the

organization's major purpose may be regarded as campaign activity, the corporation would be

classified as a political committee"); *Leake*, 525 F.3d at 287 ("an empirical judgment as to

whether an organization primarily engages in regulable, election-related speech"), or by the

organization's central purpose revealed in its organic documents, *MCFL*, 479 U.S. at 252 n.6

("[O]n this record . . . MCFL['s] . . . central organizational purpose is issue advocacy."). Thus,

the first test for major purpose requires a comparison of the entity's total disbursements for a year

with its unambiguously campaign related and regulable expenditures, so that only the amount of true political "contributions" and "expenditures" would be counted. The second test requires an examination of the entity's organic documents to determine if there was an express intention to operate as a political committee, e.g., by being designated as a "separate segregated fund" (an internal "PAC") under 2 U.S.C. § 441b(2)(c). Because *Buckley*'s and *MCFL's* major-purpose test is an authoritative construction of the definition of "political committee," and a constitutional limit on the application of the political committee requirements of FECA, the FEC's enforcement policy that does not comply with this construction is beyond the FEC's statutory authority.

58. Because the FEC's enforcement policy for determination of PAC status goes beyond any permissible construction of the major-purpose test, employs invalid regulations to determine whether the entity received a "contribution" or made an "expenditure," is unconstitutionally vague and overboad, and is "in excess of the statutory . . . authority . . ." of the FEC, it is void under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Wherefore, CTP prays for the following relief:

1. A declaratory judgment that CTP's Ads (*Basic Rights* and *Tragic, but True*) are neither express advocacy nor statutory "electioneering communications" that are subject to regulation under *WRTL II*'s appeal-to-vote test;

2. A declaratory judgment declaring BCRA §§ 201, 203, and 311 unconstitutional as applied to (**a**) communications that may not be prohibited as electioneering communications under *WRTL II*'s appeal-to-vote test, (**b**) CTP's Ads, and (**c**) CTP's materially-similar future ads;

3. A preliminary and permanent injunction enjoining the FEC from enforcing the Disclosure Requirements as applied to (**a**) communications that may not be prohibited as electioneering

communications under *WRTL II*'s appeal-to-vote test, (**b**) CTP's Ads, and (**c**) CTP's materially-similar future ads;

4. A declaratory judgment that the FEC's PAC-status enforcement policy is unconstitutional on its face and as applied and void for being beyond statutory authority;

5. A preliminary and permanent injunction enjoining the FEC from employing its PAC-status enforcement policy to enforce FECA's PAC provisions;

6. Costs and attorneys fees pursuant to any applicable statute or authority; and

7. Any other relief this Court in its discretion deems just and appropriate.

## **VERIFICATION**

I, William W. Peaslee, declare as follows:

1. I am the Incorporator of CTP and an officer.

2. I have personal knowledge of CTP and its activities, including those set out in the

foregoing *Complaint*, and if called upon to testify I would competently testify as to the matters

stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the

factual statements in this *Complaint* concerning CTP and its activity are true and correct.

Executed on October 2, 2008.

William W. Peaslee

## VERIFICATION

I, Holly Lynn Koerber, declare as follows:

1. I have personal knowledge of myself and my activities, including those set out in the foregoing *Complaint*, and if called upon to testify I would competently testify as to the matters stated herein.

2. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Complaint* concerning myself and my activities are true and correct. Executed on October 2, 2008.

Holly Lynn Koerber

Dated:   October 2, 2008

                                    Respectfully submitted,


/s/ Paul Stam                       /s/ James Bopp, Jr.
Paul Stam, paulstam@bellsouth.net   James Bopp, Jr., jboppjr@aol.com
State Bar No. 6865                    Ind. Bar No. 2838-84
STAM FORDHAM & DANCHI, P.A.         Richard E. Coleson, rcoleson@bopplaw.com
P.O. Box 1600                        Ind. Bar No. 11527-70
510 W. Williams Street              Clayton J. Callen, ccallen@bopplaw.com
Apex, NC 27502                       Mo. Bar No. 59885
919/362-8873 telephone              Sarah Troupis, stroupis@bopplaw.com
919/387-7329 facsimile               Wis. Bar No. 1061515
*Local Counsel for Plaintiffs*      BOPP, COLESON & BOSTROM
                                    1 South Sixth Street
                                    Terre Haute, IN 47807-3510
                                    812/232-2434 telephone
                                    812/234-3685 facsimile
                                    *Lead Counsel for Plaintiffs*